### BRIGHT et al. v. VIRGINIA & GOLD HILL WATER CO.

(Circuit Court of Appeals, Ninth Circuit. February 7, 1921.)

No. 3481.

1. **Witnesses ⬅️154—Testimony of party to transaction with corporation through agent since deceased incompetent.**

   Under Rev. Laws, Nev. § 5419, providing that "no person shall be allowed to testify (1) when the other party to the transaction is dead," the testimony of a witness, who was interested at the time, to a parol contract with defendant corporation, *held* incompetent, where defendant's superintendent, who is alleged to have made the contract on its behalf, is dead.

2. **Waters and water courses ⬅️257 (1)—Irrigation company may discontinue service on refusal to pay agreed price.**

   In an action against an irrigation company for refusal to furnish water to a consumer, an instruction that, if the jury found that a contract was made between the parties on refusal of plaintiff to pay the agreed price for water furnished, defendant was justified, after due notice, in refusing further service, *held* correct.

In Error to the District Court of the United States for the District of Nevada; Edward S. Farrington, Judge.

Action at law by Rose Bright and others against the Virginia & Gold Hill Water Company. Judgment for defendant, and plaintiffs bring error. Affirmed.

See, also, 254 Fed. 175.

This action was instituted by Rose Bright and others against the Virginia & Gold Hill Water Company, a corporation. There was a judgment for the defendant, on the refusal of the plaintiff to amend her complaint after demurrer to an amended complaint was sustained. Upon review this court reversed the judgment of the District Court, with directions to overrule the demurrer, with leave to the defendant company to answer. Bright v. Virginia & Gold Hill Water Co., 234 Fed. 839, 148 C. C. A. 437. The complaint alleges that the defendant company was engaged in business in Nevada as a water company, impounding, ditching, fluming, storing, and distributing water for the purposes of irrigation and domestic uses for pay; that for more than 30 years plaintiffs and their predecessors owned the land described in the complaint, and the water and water rights pertinent thereto; that for

---

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

40 years defendant, by ditches, impounding waters, and use of tanks, has diverted the waters of Marlette Lake, Nev., for mining, agricultural, and domestic uses, and permitted the water so appropriated to overflow along a natural channel to the lands belonging to Garavanto, and dug a ditch to convey the overflow away from the lands, but it gave way and damaged the lands; that Garavanto prepared to bring suit against the company for such injuries by overflow, whereupon Garavanto and the defendant company made an oral agreement, whereby Garavanto would permit the overflow waters to flow across his land, and defendant would have the right of way for the overflow waters for all the time that it would be engaged in furnishing water pursuant to articles of its incorporation, and that Garavanto and his successors would have the right to divert the waters and use the same, without charge or interference, to irrigate the lands to the extent in which the overflow water then and there ran as long as defendant was engaged in the business of its incorporation and carried on its business as averred in the complaint; that in pursuance of the agreement, and in consideration of the use of the water for irrigation, Garavanto waived his right of action for damages for the injuries he had sustained, and consented that the overflow waters from the works of the defendant should run down the natural channel and ravine, and gave a right of way therefor through the lands; that in pursuance of the agreement Garavanto began to use the water, and irrigated 100 acres for 7 years, and planted crops and orchards, and increased the value of the land; that he then sold the lands to one Raffetta, through whom by mesne conveyances the premises have become vested in fee in the plaintiffs in the present action, together with the right to use the water; that under the agreement, up to the year 1913, plaintiffs and their predecessors and grantors have used the overflow water, and the same have overflowed by permission under the agreement. It is alleged that the lands are arid, and that with the consent of defendant the waters were used for 40 years in pursuant of the agreement; that in 1913 defendant cut off the water and ruined plaintiffs' crops, all in violation of the agreement and to the damage of the plaintiffs.

The defendant answered, denying the material allegations of the complaint, and putting in issue the existence of the alleged Garavanto contract, and the use and the right to the use of the water thereunder. Defendants also alleged a counterclaim for a balance on account as rental for water furnished by the defendant to plaintiffs, under an agreement or lease with plaintiffs, alleged to have been made about 10 years before 1913, and which called for delivery or let down from its works of 4 miner's inches of water during the irrigating season of each year, in consideration of which plaintiffs and their predecessors in interest agreed to pay defendant a stipulated annual rental on the 1st of July each year, and that plaintiffs owed defendant rentals for the years 1911 and 1912; that in 1913 defendant failed to furnish water, because of failure to pay the sums past due. Defendant pleaded that plaintiffs are estopped from claiming right to have the water. The plaintiffs denied the existence of any contract for water, other than that heretofore referred to in the statement of the complaint, and denied that there had been any water furnished under any agreement, except as set forth in their complaint.

The case was tried to a jury. Plaintiffs offered a witness to prove that one Overton, deceased, an officer of the defendant corporation, made the alleged Garavanto contract. The defendants objected to the testimony of such witness, on the ground that she could not testify concerning transactions had with a deceased officer of the defendant corporation. The court ruled that under the statute of Nevada such testimony was not competent and declined to receive it. After the ruling of the court plaintiffs obtained a continuance in order to prepare an amendment. When the case was again called, counsel for plaintiffs said that they would propose no amendment, having reached the conclusion that they could proceed to trial without an amendment. Defendants objected to plaintiffs proceeding under any theory other than that which had been presented at the time the continuance was given, whereupon plaintiffs' counsel announced that they were not proceeding under a new theory, but would prove the Garavanto contract, and that they intended to rely, not only upon that contract, but upon two other distinct grounds alleged in the

complaint: One, the legal duty of the defendant, a public service corporation, to furnish the water without a contract; the other, the contract called the "four-inch contract," set up by the defendant, "not as a defense to this action, but merely as an estoppel against plaintiffs to rely upon the Garavanto contract." At the close of plaintiffs' evidence, and again at the close of all evidence, defendant moved for a directed verdict, on the ground that the evidence failed to support the claim set forth in the plaintiffs' complaint. These motions were overruled, and after instructions a verdict was rendered for the defendant, and judgment was rendered accordingly. Plaintiffs then sued out writ of error.

H. V. Morehouse and Augustus Tilden, both of Reno, Nev., for plaintiffs in error.

Cheney, Downer, Price & Hawkins, of Reno, Nev., for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). [1] The plaintiffs contend that the court erred in excluding the testimony of Mrs. Raffetta, called to prove that between 1880 and 1884, when she was living upon the ranch, which then belonged to her husband and herself, and afterwards passed to Garavanto, Mr. Raffetta and Garavanto and Mr. Overton, as superintendent of the defendant corporation, since deceased, made an oral agreement whereby the defendant corporation would give to Raffetta all the water he wanted for his ranch, provided Raffetta did not bring action to enforce damages done by overflow of one of defendant's ditches. The District Court held that under section 477 of the Nevada statute (Rev. Laws, § 5419) the witness could not testify. Section 477 provides:

"No person shall be allowed to testify (1) when the other party to the transaction is dead."

In Roney v. Buckland, 4 Nev. 56, the court, discussing an earlier, but somewhat similar, Nevada statute, said:

"The answer is obvious: Because the Legislature, doubtless, deemed it injudicious and unjust to allow a person to testify in his own behalf about a transaction when the other person actually engaged in it is unable to appear by reason of death."

Crane v. Closter, 13 Nev. 280, and Vesey v. Benton, 13 Nev. 284, were also under earlier statutes and prior to the section as hereinbefore quoted. Burgess v. Helm, 24 Nev. 242, 51 Pac. 1025, was decided after 1881, and is to be distinguished, in that the testimony there admitted was not from a party to the transaction, but from a distinterested person as to admissions made by a party subsequent to the transaction. In Bagby, Adm'r, v. American Surety Co., 161 Ky. 78, 170 S. W. 492, the Supreme Court of Kentucky said of a generally similar statute:

"The whole object of the Code provision is to place the living and the dead upon terms of perfect equality, and, the dead not being able to testify, the living shall not."

See Edmonds v. Scharff (Mo.) 213 S. W. 823.

Some cases hold that one who acts as agent for another in the making of a contract is not a party thereto, within the meaning of a statute

forbidding the survivor to testify when one party to a contract or cause of action is dead, and hence such agent is competent. 40 Cyc. 2299; Clark v. Thias, 173 Mo. 628, 73 S. W. 616; Beaston v. Portland Trust & Savings Bank, 89 Wash. 627, 155 Pac. 163, Ann. Cas. 1917B, 488. But the better reasoning seems otherwise. Carroll v. United R. Co., 157 Mo. App. 247, 137 S. W. 303; Edmonds v. Scharff, supra; Williams v. Edwards, 94 Mo. 447, 7 S. W. 429. The underlying purpose of the statute being to prevent one from testifying in his own behalf about a transaction when the other person actually engaged in it is dead, we cannot see how a distinction may well be drawn between the agent of a corporation acting solely for his company and one acting in his individual capacity. See cases already cited.

Jones on Evidence, vol. 4, § 785, considers the meaning of the word "transaction," as used in a statute such as is under consideration, and defines the general policy as excluding the evidence of an interested witness concerning any transaction between himself and a deceased person, or in which the witness in any manner participated and all communication between the person deceased and the witness, including communication in the presence or hearing of the witness, if he in any way was a party thereto, or communications to either one of two or more persons, if all were interested.

"Transactions and communications embrace every variety of affairs which conform the subject of negotiation, interviews or actions between two persons and include every method by which one person can derive impressions or information from the conduct, condition or language of another."

In view of the policy of the statute we must hold that there was no error in the ruling which excluded the proof offered. After excluding the evidence the court submitted to the jury such other evidence as there was upon the question whether there was an oral agreement as alleged between Garavanto and the defendant company, and charged that while there was no direct evidence of such an oral contract there was circumstantial evidence proper for their consideration. We need not detail the testimony, for the verdict of the jury was against the plaintiffs, and thus it was determined that the oral contract did not exist. Plaintiffs say, however, that the Garavanto contract might and should have been disregarded "as surplusage," in that it could amount to nothing more than a "waiver of tolls" and "of compliance with regulations, etc., exacted of ordinary customers," and they argue that there was a relation of public service corporation and customer; that there was a "tortious diversion of the water," which was actionable as a breach of public duty, regardless of the existence or nonexistence of any contract, and that there was a waiver of conditions in the four-inch contract.

While the position just stated is a departure from that relied upon until after the court excluded the testimony of Mrs. Raffetta, we pass possible question of estoppel by reason of inconsistent attitudes, and briefly inquire into the merits of the contention. By the terms of the 4-inch contract as pleaded by way of counterclaim defendant was to furnish for plaintiffs' ranch a limited quantity of water at a certain rental. Plaintiffs denied the existence of the alleged contract or that

any water was furnished except under the agreement pleaded in their complaint. Defendant's evidence, tending to support the fact that there was such a contract, was that defendant sold water, about 4 inches, to the Bright ranch for 11 years prior to the time of trial of an action, which had been brought in the state court, under an arrangement made between the water company and a Chinaman, formerly on the ranch, but that, when the agreement for the supply of water expired, Overton, deceased superintendent of the defendant company, declined to make further agreement with the Bright ranch, or with the Chinaman, though the defendant continued to supply the same quantity of water to the ranch from year to year on the same basis as theretofore.

The water supplied, according to the testimony of Superintendent Leonard, was under the lease; it came from tanks, the intake of which ran across Washoe Valley, about 2 miles above the Raffetta ranch. From the tanks defendant had a flume, about 4,000 feet long, which took the water from the overflow and carried it into a canyon, and from the canyon it ran down to the Raffetta ranch. Witness said that there had been difficulty concerning the water between Raffetta and the company, and that he knew water was needed for irrigation in 1913, and that four inches of water were not sufficient to irrigate the land; that often more than 4 inches flowed; that the water was brought down from a lake to the intake of defendant's syphon, where there is an overflow box; that it flowed down from the overflow point when plaintiffs pay for it, but that defendant ceased to continue to deliver, because the Bright people were in arrears in the sum of $98 for 1911 and 1912 rentals, and that, although the owners were notified that if the bill was not paid the company would not supply water for 1913, nothing was done by the ranch owners; that in 1913 water was low; that explanations were made to Mrs. Bright at the time, and that effort was made to arrange with her to take the 4 inches of water from a hose connection at Lakeview, but that she declined it, and ordered water shut off, with the result that she lost her crop. The superintendent also said that the surplus water which came from the flume in 1913 would not reach the ranch in the summer, and that an overflow had to be created from Marlette Lake in order to deliver water to either one of the ranches.

[2] The court did not overlook the relationship of the defendant as a public service corporation, for it carefully instructed that to the extent of its ability defendant was under obligation to supply water to those who demanded it and paid therefor; that the consumer had a right to have water and as long as he paid current installments and otherwise conforms to reasonable regulations governing the supply; but that where the price of water had been agreed upon the law would presume a promise to pay the rate as agreed, and if the consumer refused to pay the company would be justified in shutting off the water. Again, the court charged that if the defendant notified the plaintiffs that, unless the amount due under the agreement, if there was such agreement, was not paid, defendant would not furnish any more water, and that if plaintiffs failed to pay defendants could not be held liable for damages. The court also charged that the defendant

could not deprive the plaintiff of such water merely because the company did not have sufficient waste water or sufficient water to supply all its customers, provided the jury found that plaintiffs were entitled to the water claimed by them in their complaint. The jury found that the 4-inch contract was made, and that under it plaintiffs owed defendant $98.53.

We cannot see that there was any waiver of the obligations under the contract. There was evidence that plaintiffs in July, 1913, asked for as much water as possible to be furnished by hose discharge from Lake View station to augment tank overflow, and that defendant's superintendent by letter consented, provided it was not to be construed as an admission of plaintiffs' right to have the water when defendant needed it for its business. Surely the act of defendant's superintendent was not a waiver of any of its rights in this litigation, and the requested instruction to the effect that merely furnishing water in 1913 constituted a waiver would have been misleading.

The court was right, we think, in refusing requests presenting general rules concerning the appropriation of water, and the general obligations of public service corporations with respect to the furnishing of water. The duty of defendant in the premises was sufficiently defined in the charge given, which was relevant to the issues of the case on trial.

Other requested instructions included the proposition that, while public service corporations could make and enforce reasonable rules and regulations, the question of the observance or violation of rules or regulations was not a matter involved in the case and could not be considered by the jury. In view of the issues presented by the pleadings, our opinion is that the request did not state the law correctly, and that the court was right in charging that defendant was justified in refusing to furnish the water, if, after notice, plaintiffs refused to pay, provided the contract existed as pleaded.

By another request plaintiffs asked the court to charge that the question involved was whether plaintiffs were entitled to water from the water system, and not whether or not any water delivered to or used by plaintiffs from defendant's water system was waste water, and, furthermore, that if plaintiffs were entitled to water, it was immaterial whether the water was waste or live water, and that if defendant had not sufficient waste water to supply plaintiffs' right, if any right they had, up to the limit thereof, it was defendant's duty to let down and discharge live water to plaintiffs up to said limit. There was no error in refusing the request, because the court instructed fully that, if the defendant made a contract for delivery of water to the plaintiffs, it must live up to it, unless by the refusal of the plaintiffs to pay the rental the defendant rightfully cut off the water after notice that, unless the arrears were paid up, the supply would be shut off.

We have carefully considered other points presented, and find no ground for disturbing the judgment.

The judgment is affirmed.